IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Carolina Pines I, LLC,           )<br>                         )<br>      Plaintiff,      )<br>                         )<br>v.                        )<br>                         )<br>City of Abbeville Public Works, Abbeville )<br>County Public Works, Aiken County Solid )<br>Waste, Beaufort County Solid Waste,   )<br>Charleston County Solid Waste, Horry   )<br>County Solid Waste, Laurens County Public )<br>Works, Lexington County Solid Waste, City )<br>of North Augusta Public Works,     )<br>Orangeburg County Department of Public  )<br>Works, Sumter County Public Works,   )<br>                         )<br>      Defendants.    )<br>―――――――――――――――――) | Civil Action No. 3:16-cv-1124-TLW |

**<u>ORDER</u>**

Plaintiff Carolina Pines I, LLC filed this action alleging that Defendants[1] are liable for response costs for the removal of hazardous substances from Plaintiff's property based on Defendants' relationship with Creative Recycling Systems of North Carolina, LLC (CRS), an electronics recycling and processing company. Specifically, Plaintiff alleges that it incurred response costs when it cleaned Defendants' electronic waste (e-waste) out of its warehouse.

Defendants filed a Motion for Summary Judgment on August 5, 2017. ECF Nos. 86, 87. After careful review of the motion and evidence presented at the hearing on January 17, 2018, the

---

[1] City of Abbeville Public Works, Abbeville County Public Works, Aiken County Solid Waste, Beaufort County Solid Waste, Charleston County Solid Waste, Laurens County Public Works, City of North Augusta Public Works, Orangeburg County Department of Public Works, and Sumter County Public Works were dismissed from this case before trial as these parties settled with Plaintiff. Horry County Solid Waste Authority (Horry County) and Lexington County Solid Waste (Lexington County) are the remaining Defendants.

Court determined there were questions of fact as to Plaintiff's claim for recovery of response costs pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9607(a)(3), and denied summary judgment as to Plaintiff's CERCLA claim. On July 31, 2018, Defendants amended their answer to include a counterclaim against Plaintiff. ECF No. 130. This case was tried as a bench trial on August 28, 2018 through August 29, 2018. The Court has carefully considered the applicable law, arguments of counsel, and evidence in the record, and, taking into account the credibility and accuracy of the evidence, the Court finds that Plaintiff is entitled to an award of $168,064.70 from Horry County and $72,214.84 from Lexington County for the reasons stated herein.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court makes the following findings of fact and law by preponderance of the evidence and pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that any findings of fact constitute conclusions of law, they shall be so regarded.

### I.     Background

Plaintiff filed this action alleging that Defendants owed Plaintiff damages based on Defendants' relationship with CRS. At summary judgment, Plaintiff's claims for violations of the South Carolina Waste Management Act (SCWMA), contribution pursuant to § 113(f) of CERCLA, ejectment and rent, waste, inverse condemnation, trespass, and negligence were dismissed. ECF No. 110. The Court denied summary judgment as to Plaintiff's remaining claim for arranger liability under CERCLA. *Id.* Subsequently, Defendants amended their answer and brought a counterclaim in the alternative alleging that, should they be liable as arrangers, Plaintiff owes contribution pursuant to § 113(f) of CERCLA. Therefore, the issues at trial were (1) whether Defendants were liable as arrangers for cleanup costs and, if so, (2) whether Plaintiff owed

Defendants contribution for the cleanup costs as the owner of the facility.

## II.     The Parties

Plaintiff Carolina Pines I, LLC, is an Ohio limited liability company that owned the warehouse property located at 1061 Carolina Pines Road, Units 3-5, Blythewood, South Carolina. ECF No. 74 at ¶ 2. Plaintiff's sole asset was the Blythewood property. Trial Tr. 32:24–33:3. Horry County and Lexington County are political subdivisions of the State of South Carolina that collect electronic equipment and waste from the customers within their service areas. ECF Nos. 74 at ¶ 3; 130 at ¶ 4. Plaintiffs brought this action alleging, *inter alia*, that Defendants were liable for damages pursuant to a federal statute, 42 U.S.C. § 9607(a). This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c), and 42 U.S.C. § 9613(b) because the claims arise out of an alleged release at a facility located in the District of South Carolina.

## III.     Findings of Fact

1.     At trial, Plaintiff called five (5) witnesses, 1) Jason Franks, Plaintiff's Asset Manager; 2) Peter G. Oliver, qualified as an expert in e-waste management, treatment, recycling, and disposal; 3) David L. Eger, Solid Waste Management Director of Lexington County (by deposition); 4) Ester Murphy, Director of Recycling and Corporate Affairs of Horry County (by deposition); and 5) Daniel Cheek, qualified as an expert in civil engineering.

2.     Defendants called five (5) witnesses, 1) David L. Eger, Solid Waste Management Director of Lexington County; 2) Carl D. Knight, Executive Director of Horry County; 3) Esther Murphy, Director of Recycling and Corporate Affairs for Horry County; 4) Jan S. Bitting, Director of Finance for Horry County; 5) Arthur Douglas Braswell, qualified as an expert in municipal solid waste and recycling and hazardous waste compliance.

3.     CRS is an electronics recycling and processing company. Trial Tr. 4:17–18; ECF No. 74 at ¶ 2. In addition to the facility located in Blythewood, South Carolina, CRS also had facilities in Tampa, Florida and Raleigh, North Carolina. Trial Tr. 177:18–20. The Blythewood facility was CRS's only processing facility located in South Carolina. Trial Tr. 54:22–23; ECF No. 90 at 5.

4.     On June 26, 2013, Plaintiff and CRS entered into a lease agreement wherein Plaintiff leased the Blythewood facility to CRS for "distribution of used electronic materials for recycling and for no other purpose without the written consent of the Lessor." Pl.'s Ex. 1 at CP_000369. Article 15 of the lease states, "[t]he Lessor shall retain duplicate keys to all of the doors of the Leased Premises. The Lessor or its agents shall have the right to enter upon the Leased Premises at all reasonable hours for the purpose of inspecting the same . . . ." *Id.* at CP_000376. The lease agreement contains a "hold harmless" provision stating that CRS would indemnify and otherwise hold Plaintiff harmless for, *inter alia*, "all liabilities, losses, costs or expenses . . . and damages arising out of, or as a result of, (i) any 'release' as defined in Section 101(22) of CERCLA, of any 'hazardous substance', as defined in Section 101(14) of CERCLA . . . ." *Id.* at CP_000381–82. It also contains a provision titled "Financial Statements," which was added specifically for the CRS lease agreement and is not in the form leases that Plaintiff usually enters into with its clients. *See* Trial Tr. 45:21–46:7. The "Financial Statements" provision states that CRS shall furnish Plaintiff with the "most current audited annual financial statement as it pertains to the Leased Premises" at Plaintiff's request. Pl.'s Ex. 1 at CP_000382.

5.     Plaintiff received rent from CRS pursuant to the lease agreement. Pl.'s Ex. 1 at 3 (indicating that the fixed monthly rent from October 2013 to September 2014 was $9,800.00 per month); Trial Tr. 56–57.

4

6.     At trial, Plaintiff's witness, Mr. Franks, testified that his associate was expected to go to the facility annually. However, Mr. Franks had no personal knowledge regarding whether his associate had visited or inspected the property before CRS's bankruptcy. Trial Tr. 38:5–22. Mr. Franks also stated that Carolina Pines was aware "that the equipment [CRS was] putting in [the facility] could have hazardous substances." Trial Tr. 37:9–10. CRS stored e-waste at the facility from July 2013 until its bankruptcy in August 2014. *See* Pl.'s Exs. 1, 4. Despite knowledge of the hazardous substances, there was no evidence presented at trial that Plaintiff inspected the warehouse while CRS occupied the premises or that it requested CRS's financial records before CRS declared bankruptcy. *Id.*

7.     Defendants are entities that collect electronic equipment and waste from the public within their service areas and dispose of that waste as required by state law. Defendants and CRS entered into a contract on or around June 8, 2009, for processing, recycling, and disposal of the e-waste generated by Defendants. Pl.'s Ex. 51. The contract noted that Defendants' e-waste contained hazardous substances. *Id.*; Trial Tr. 84:16–21; ECF No. 63-1 at 8.

8.     Pursuant to the contract, CRS hauled Defendants' e-waste to the facility, where it was stored and processed. Trial Tr. 173–75.

9.     The contract contemplates recycling of junk/surplus equipment. Pl.'s Ex. 51 at 18. The contract also contemplates disposal of e-waste. *Id.*; ECF No. 63-1 at 8. It contains the following statement: "The Contractor agrees to adhere to [Environmentally Sound Management] criteria from the time the surplused electronic equipment leaves the possession of the Contract User until the time the equipment/materials are reused, recycled or disposed as waste, to ensure that no hazardous constituents are released." *Id.* (emphasis omitted). The contract notes that "[t]he Contractor understands the risks presented to persons, property and the environment in the handling,

transportation, storage, reuse, de-manufacturing, recycling and management of materials hazardous and non-hazardous and wastes pursuant to the contract." *Id.* at 15. It also provides, "Electronic Equipment Disposition. All items that are recycled or disposed must have an audit trail on the equipment's final destination . . . ." *Id.* at 16.

10.    Defendants did not charge individuals when they collected the public's e-waste. Trial Tr. 187:2–13. From 2009 until 2012, CRS did not charge Defendants for its services. Beginning in 2012, CRS charged Defendants to collect, process, and dispose of their e-waste and provided Defendants a "rebate" for intact electronics. Trial Tr. 181:19–183:9.

11.    On August 29, 2014, CRS filed for bankruptcy. ECF No. 74 at ¶ 10. On September 10, 2014, the bankruptcy court approved CRS's termination and rejection of its lease with Plaintiff. *Id.*

12.    Subsequently, CRS abandoned over six million pounds of e-waste at the facility. ECF Nos. 90-1 at ¶¶ 10, 12; 90-2 at ¶ 3. After abandonment, the facility was densely packed with e-waste so that there was no space to move around. Trial Tr. 121:17–25. The e-waste was loosely shrink-wrapped and stacked two pallets high. *Id.* There was a mechanical crusher inside the warehouse and there were thirteen fifty-three-foot trailers full of e-waste outside the facility which could not be unloaded because the warehouse was full. *Id.*; Trial Tr. 81:12–18. Mr. Oliver estimated that the warehouse was about 95 to 99 percent full. Trial Tr. 95:7–11. Mr. Cheek testified that you could not move from one entry point to the other, rather you had to go around the building to access the other door. Trial Tr. 121:18–25. Mr. Oliver stated that he could tell the material had been mishandled, and the materials were piled high and not very clean. Trial Tr. 73:2–15.

13.    By letter dated November 4, 2015, Plaintiff contacted Defendants and directed Defendants to remove the equipment and e-waste. Pl.'s Ex. 8. A consent order containing the

parties' agreement to a scheduled inspection of the facility was entered on September 30, 2016. ECF No. 39. Defendants did not remove the equipment or e-waste and did not contribute to the cleanup of the facility. Trial Tr. 20:5–11.

14.     Plaintiff hired environmental consultants, Hodges, Harbin, Newberry, and Tribble, Inc. (HHNT), to provide consulting services regarding the evaluation, handling, and removal of e-waste at the facility. HHNT provided the South Carolina Department of Health and Environmental Control (DHEC) with a Material Classification Demonstration Report, which stated that to be removed, the e-waste would have to be handled as hazardous waste. DHEC approved HHNT's Report, indicating that DHEC considered the Report consistent with applicable laws and guidance. Pl.'s Ex. 9A. HHNT retained a Certified Industrial Hygienist, Ronald S. Sharpe with GEL Engineering, to evaluate contamination levels at the facility, provide a Worker Health and Safety Plan, and evaluate post-removal conditions. Based upon GEL Engineering's reports, HHNT concluded that hazardous substances manganese, copper, zinc, iron, strontium, lead, nickel, rubidium, zirconium, arsenic, titanium, tungsten, and chromium were present in dust on surfaces throughout the warehouse. *See* 40 C.F.R. 302.4; Pl.'s Ex. 9B.

15.     In order to clean up the facility, Plaintiff removed approximately 6,470,734 pounds of e-waste from the facility. Pl.'s Ex. 15.

16.     After cleanup was completed, Plaintiff sold the property. Trial Tr. 89:20–23.

17.     During the time that CRS was leasing the facility from Plaintiff, approximately July 2013 until June 2014, CRS hauled Defendants' e-waste for disposal and recycling. *See* Pl.'s Ex. 16.

18.    When Plaintiff investigated the abandoned e-waste at the facility, it found "Lexington County" and "Horry County Solid Waste" labels on the e-waste. Pl.'s Ex. 12 at 2, 4, 5, 10, 13. It is unclear who labeled Horry County's Waste.

19.    Ms. Bitting testified that Horry County "did not label any waste that left . . . [its] facility." Trial Tr. 260:8–12.

20.    Records recovered at the facility that were created by CRS designate the "Service Facility" for the Defendants' e-waste as "SC." Pl.'s Exs. 6A–6B. Witnesses at trial stated that "SC" probably meant "South Carolina," and that CRS's only location in South Carolina was the facility. *See e.g.*, Trial Tr. 54:19–56:2.

21.    According to the DHEC records presented at trial, CRS hauled, processed, or disposed of approximately 2,611,418 pounds of the Defendants' e-waste from July 1, 2013 until June 30, 2014, while CRS was leasing the facility from Plaintiff. Pl.'s Ex. 7; ECF No. 63. Mr. Oliver, Plaintiff's e-waste management, treatment, recycling, and disposal expert, opined that Defendants' e-waste was present in the warehouse at the time of cleanup. At trial, Defendants argued generally that Mr. Oliver made mistakes regarding who contributed to the e-waste in the facility. The Court notes that, even by Mr. Oliver's own admission, determining the amounts of e-waste in the facility was difficult based on CRS's paperwork, DHEC's substantial records, and the significantly-cluttered, over-filled warehouse. *See* Trial Tr. 107:6–23 ("All I know is I did the best possible I could with the paperwork I had at that time."). However, the Court finds it is appropriate to accept Mr. Oliver's position regarding the amount of e-waste in the facility and his testimony regarding who generated the e-waste based on his status as an expert in electronic waste management, treatment, recycling, and disposal, and because the Court was not presented with other expert opinions disputing his calculations. Trial Tr. 107. To determine how much e-waste

was generated by each defendant, Mr. Oliver (i) examined the DHEC records indicating how much waste CRS accepted from entities during the relevant time frame, (ii) observed the state of the warehouse, the labels and paperwork on the e-waste, and the e-waste itself at the time of clean up, (iii) noted Defendants' names on the white board in the warehouse at the time of cleanup, (iv) examined the CRS receivable reports and records found at the facility, and (v) considered the Defendants' own records. This Court finds Mr. Oliver's process to determine what waste was contributed by whom, and in what amount, is sufficiently persuasive and reliable to warrant using it to reach a conclusion in this case.

22.     Lexington County was aware that its e-waste was traveling to the "New location: 1061 Carolina Pines Drive #8, Blythewood, SC 29016." Defs.' Ex. 10. Lexington County sent employees to the facility, where they observed the warehouse and CRS's process. *Id.*; *see* Pl.'s Ex. 150 at 1, 3; Trial Tr. 19:17–19, 55:16–56:2, 190–91, 257–58.

23.     Mr. Cheek testified that metal dust, like the kind that crushing Defendants' e-waste would produce, was on top of the pallets that were found in the warehouse during cleanup. Trial Tr. 136:19–25.

24.     The Court concludes the evidence supports a finding that Defendants' e-waste was at the facility at the time of cleanup.

25.     Mr. Oliver testified that the e-waste recovered in the facility included waste that would typically contain hazardous substances such as lead, cadmium, arsenic, strontium, and zinc. Trial Tr. 84:13–21. Mr. Cheek testified that dust samples taken during clean up of the facility contained lead, zinc, tungsten, titanium, zirconium, and other types of metals. Pl.'s Ex. 9B; Trial Tr. 133:4–7. Mr. Cheek also opined that the dust came from the electronics in the warehouse. Trial Tr. 133:8–17.

26.     Mr. Cheek stated that the metal dust in the facility was created by the mechanical crusher that CRS was using, as well as the "mismanagement of the material inside the warehouse." Trial Tr. 136:2–8.

27.     Mr. Cheek opined that there was a release of hazardous substances inside the open-air warehouse, and also that there "is a high potential that . . . hazardous substance was emitted . . . outside the warehouse." Trial Tr. 133:23–134:7. He further opined that the dust may have been blown out of the warehouse or "been tracked in and out either by equipment or personnel working in the warehouse." Trial Tr. 134:12–24.

28.     At trial, Mr. Oliver testified that, even if the e-waste in the facility contained recyclable components, the e-waste was not recyclable due to the condition of the e-waste and the way it was stored. Trial Tr. 88:10–89:25 ("[Q:] Was Creative Recycling in fact recycling the waste at the Carolina Pines facility? [A:] No.").

29.     Defendants' expert, Mr. Braswell, testified that the overwhelming majority of the electronic equipment was comprised of recyclable metal, plastic, and glass.

30.     Plaintiff incurred response costs consistent with the National Contingency Plan in the amount of $1,488,351.98 to remove and clean up the facility. Pl.'s Ex. 15. Defendants Abbeville County, Aiken County, Beaufort County, Charleston County, Laurens County, Orangeburg County, Sumter County, City of Abbeville, and City of North Augusta settled with Plaintiff, paying Plaintiff a total of $355,791.00. Pl.'s Ex. 17.

31.     During the period of time between July 1, 2013 and June 30, 2014, CRS picked up 1,826,494 pounds of e-waste generated by Horry County. Pl.'s Ex. 16. Mr. Oliver stated that Horry County is responsible for 28.23% of the Total Weight of Waste Volume sent to CRS from July 1, 2013 until June 30, 2014. *Id.*

32.    During the period of time between July 1, 2013 and June 30, 2014, CRS picked up 784,924 pounds of e-waste generated by Defendant Lexington County. *Id.* According to Mr. Oliver, Lexington County is responsible for 12.13% of the Total Weight of Waste Volume sent to CRS from July 1, 2013 until June 30, 2014. *Id*.

33.    These percentages of e-waste generated by Horry County and Lexington County will be used by this Court to calculate the recovery by the Plaintiff.

## IV.    Conclusions of Law

### A.    Arranger Liability

Congress enacted CERCLA in 1980 "in response to the serious environmental and health risks posed by industrial pollution." *Burlington Northern & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). "By enacting CERCLA, Congress sought to provide a mechanism for clean up of sites polluted with hazardous waste as well as a mechanism by which a governmental entity or private party may recover the cost of clean up from *all parties* responsible for the pollution of the site." *Consolidation Coal Co. v. Ga. Power Co.*, 781 F.3d 129, 156 (4th Cir. 2015) (quotations and citations omitted). The Supreme Court in *Atlantic Research* held that a PRP that incurs cleanup costs voluntarily may seek reimbursement for those costs from other PRPs pursuant to § 107(a). 551 U.S. at 139 (2007); *see also Axel Johnson Inc. v. Carroll Carolina Oil Co., Inc.*, 191 F.3d 409, 412 (4th Cir. 1999) ("Section 107(a) of CERCLA permits the United States and private parties to recover the costs of cleaning up hazardous wastes from certain defined types of person.").

In order to allege a cause of action pursuant to § 107 of CERCLA, Plaintiff must show,

(1) that the site in question is a "facility" as defined in 42 U.S.C. § 9601(9);
(2) that the defendant is a responsible person under § 9607(a);
(3) that a release or threatened release of a hazardous substance has occurred; and

> (4) that the release or threatened release has caused the plaintiff to incur response costs consistent with the national contingency plan.

*Ashley II of Charleston, LLC v. PCS Nitrogen, Inc.*, 791 F. Supp. 2d 431, 479–80 (D.S.C. 2011), *aff'd*, 714 F.3d 161 (4th Cir. 2013).

The parties in this case do not dispute that the Blythewood facility is a "facility" pursuant to 42 U.S.C. § 9601(9), or that the alleged release or threat of release has caused Plaintiff to incur necessary response costs pursuant to 42 U.S.C. § 9607(a)(4)(B). The remaining elements of Plaintiff's claim at issue are whether the Defendants are responsible persons pursuant to § 107(a) and whether there was a release or threat or release of a hazardous substance at the facility.

CERCLA imposes strict liability on four classes of persons identified as Potentially Responsible Parties (PRPs) pursuant to § 107(a). *Burlington Northern,* 556 U.S. at 610. Plaintiff alleges that Defendants are liable pursuant to § 107(a)(3).[2] Under § 107(a)(3), a PRP could be liable as an arranger if they are:

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

42 U.S.C. § 9607(a)(3). A "person" under CERCLA includes individuals, corporations, partnerships, municipalities, state governments, or the United States government. 42 U.S.C. § 9601(2).

The Court concludes that Defendants are arrangers pursuant to § 107(a)(3). Defendants entered into contracts with CRS for disposal or treatment of their e-waste, which contained

---

[2] Defendants allege that Plaintiff is a PRP pursuant to § 107(a)(1), which includes "owner[s] and operator[s] of a vessel or a facility." 42 U.S.C. § 9607(a)(1). Plaintiff does not object to this designation and the Court concludes that Plaintiff is a PRP pursuant to § 107(a)(1) because it was the owner of the facility during the relevant time period.

hazardous substances like lead. *See* Trial Tr. 84:10–21. While the evidence presented at trial shows that not all of the e-waste at the facility was generated by the Defendants, Plaintiff has shown by a preponderance of the evidence that at least some of the Defendants' e-waste was at the facility. Specifically, (i) there was dust on top of the pallets discovered at the time of clean up, *see supra* ¶ 23; (ii) there were pallets recovered at the time of clean up with "Lexington County" and "Horry County Solid Waste" labels, *see supra* ¶ 18; (iii) CRS hauled, processed, or disposed of approximately 2,611,418 pounds of the Defendants' e-waste while CRS was leasing the facility from Plaintiff, *see supra* ¶¶ 21, 30–31; (iv) Plaintiff presented documents that indicate that CRS's "service facility" for Defendants' e-waste was "SC," which several witnesses testified means the service facility was "South Carolina," *see supra* ¶ 20; (v) the only CRS location in South Carolina was the facility, *see supra* ¶ 3; (vi) Lexington County was aware that its e-waste was traveling to the "New location: 1061 Carolina Pines Drive #8, Blythewood, SC 29016," *see supra* ¶ 22; and (vii) Lexington County sent employees to the facility to observe the warehouse and CRS's process, *see supra* ¶ 22. Thus, the Court finds that Defendants' e-waste was in the warehouse, and that Plaintiff has shown by a preponderance that Defendants arranged for disposal or treatment of their e-waste at the facility.

The Court also concludes that there was a release or threat of release of hazardous substances at the facility. *See* 42 U.S.C. 9601(14) (defining "hazardous substance"). The Code of Federal Regulations designates, specifically, substances that are hazardous for the purposes of CERCLA. 40 C.F.R. §§ 302.1, 302.4. Section 302.4 also "sets forth reportable quantities for hazardous substances designated under section 311(b)(2)(A) of the Clean Water Act," and the Clean Water Act's designation is incorporated in § 101(14), CERCLA's definition of hazardous substance. 40 C.F.R. § 302.1; s*ee* 42 U.S.C. § 9601(14). "Hazardous substance," according to

40 C.F.R. § 302.3, "means any substance designated pursuant to 40 CFR part 302." "Lead" is included in the listing of hazardous substances found in Table 302.4—List of Hazardous Substances and Reportable Quantities. 40 C.F.R. § 302.4. Importantly, courts have found that "[l]ead in any amount is a hazardous substance." *Otay Land Co. v. United Entrs. Ltd., L.P.*, 440 F. Supp. 2d 1152, 1160 (S.D. Cal. 2006), *vacated on other grounds by* 338 F. App'x. 689 (9th Cir. 2009) (citing *A & W Smelter & Refiners, Inc. v. Clinton,* 146 F.3d 1107, 1110 (9th Cir. 1998)).

Plaintiff presented sufficient evidence that dust containing hazardous substances, as defined in § 101(14), was found in the open-air warehouse. Pl.'s Exs. 9A, 9B. In addition, Plaintiff's expert testified that the e-waste, which was stacked and on pallets covering the warehouse floor, contained hazardous substances. *See supra* ¶ 25; 42 U.S.C. § 9601(14). Further, Plaintiff presented expert testimony that it is likely the dust was released outside the facility. Lastly, Plaintiff's expert testified that there was a threat of release of hazardous substances based on the e-waste found in the facility during the cleanup. Defendants did not sufficiently dispute this evidence at trial. Therefore, the Court finds that there was a release or threat of release of hazardous substances in the facility. *See* 42 U.S.C. §§ 9601(14), (22).

At trial, Defendants argued that Plaintiff did not meet its burden because it failed to show that the e-waste from these Defendants was the e-waste that caused a release of hazardous substances. However, in *United States v. Monsanto*, the Fourth Circuit found that the generator defendants were liable as arrangers even when the plaintiff had not presented evidence that the chemical reactions that caused damage could be traced, specifically, to the defendants' chemical drums. 858 F.2d 160, 170 (4th Cir. 1988). In *Monsanto*, drums of hazardous chemicals had deteriorated and leaked in a warehouse, causing fires, explosions, and noxious, toxic fumes. *United States v. S.C. Recycling & Disposal, Inc.*, 653 F. Supp. 984, 990 (D.S.C. 1986), *aff'd in part*, *rev'd*

14

*in part*, *sub nom. United States v. Monsanto* 858 F.2d 160 (4th Cir. 1988). There was evidence that drums belonging to each of the generator defendants were observed at the site during and before cleanup, and hazardous substances of the same type as the defendants' were identified in samples taken at the site during cleanup operations. *Id.* at 992. The Fourth Circuit affirmed the district court, finding that the evidence in the record was sufficient to hold the generator-defendants liable as arrangers under § 107(a)(3). *Monsanto*, 858 F.2d at 170.

Defendants' e-waste was discovered at the facility during cleanup. *See supra* ¶ 24. At trial, Defendants did not present evidence to dispute that hazardous substances of the same type found in their e-waste were identified on the Plaintiff's property at the time of cleanup. The evidence presented at trial showed that hazardous substances like those generated by Defendants were present at the site, and the Court finds that there is sufficient evidence to hold the Defendants liable as arrangers. *See Monsanto*, 858 F.2d at 170.

### B. The Recycling Exception

At trial, Defendants argued that they are not liable for response costs pursuant to § 107(a) because they fit under the recycling exception to CERCLA liability: the Superfund Recycling Equity Act (SREA). In 1999, CERCLA was amended by the SREA "to remove any disincentives and impediments to recycling that were created by CERCLA and to promote the recycling of scrap materials . . . ." *Evansville Greenway & Remediation Tr. v. S. Ind. Gas & Elec. Co.*, No. 3:07-CV-66-SEB-WGH, 2011 WL 13237784, at *3 (S.D. Ind. Feb. 25, 2011); *see* 42 U.S.C. § 9627. The amendment, § 127(a), contains an exception for arrangers if they prove by a preponderance that they were recycling certain types of recyclable materials. 42 U.S.C. § 9627(a)(1) ("As provided in subsections (b), (c), (d), and (e) of this section, a person who arranged for recycling or recyclable material [as defined by SREA] shall not be liable under Sections 9607(a)(3) and 9607(a)(4) of this

title with respect to such material."). However, a recycler-arranger may still be held liable for a material that is not recyclable. *See* 42 U.S.C. § 9627(a)(2). When considering the applicability of the Recycling Defense to a particular defendant, courts are required to make two determinations: (1) is the material in question "recyclable material," and, if so, (2) did the defendant "arrange for the recycling" of the recyclable material? *Evansville Greenway*, 2011 WL 13237784, at *4.

According to § 127, "[r]ecyclable materials" include,

> scrap paper, scrap plastic, scrap glass, scrap textiles, scrap rubber (other than whole tires), scrap metal, or spent lead-acid, spent nickel-cadmium, and other spent batteries, as well as minor amounts of material incident to or adhering to the scrap material as a result of its normal and customary use prior to becoming scrap.

42 U.S.C. § 9627(b).

To meet the exception, the burden is on Defendants to prove that they met the criteria contained within §§ 127(c), (d), and (e). Section 127(c) requires that an arranger show that at the time of the transaction:

> (1) The recyclable material met a commercial specification grade.

> (2) A market existed for the recyclable material.

> (3) A substantial portion of the recyclable material was made available for use as a feedstock for the manufacture of a new saleable product.

> (4) The recyclable material could have been a replacement or substitute for a virgin raw material, or the product to be made from the recyclable material could have been a replacement or substitute for a product made, in whole or in part, from a virgin raw material.

> (5) . . . the person exercised reasonable care to determine that the facility where the recyclable material was handled, processed, reclaimed, or otherwise managed by another person . . . was in compliance with substantive (not procedural or administrative) provisions of any Federal, State, or local environmental law or regulation, or compliance order or decree issued pursuant thereto, applicable to the handling, processing, reclamation, storage, or other management activities associated with recyclable materials.

42 U.S.C. § 9627(c). CERCLA §§ 127(d) and (e) require that when dealing with scrap metal or batteries, an arranger must also show that the arranger was in compliance with any applicable regulations or standards regarding the storage, transport, management, or other activities associated with the recycling of scrap metal or batteries, respectively, and that the arranger did not melt the material prior to a scrap metal transaction. 42 U.S.C. §§ 9627(d)–(e).

After careful consideration, the Court concludes that Defendants do not fall under the recycling exception. It is undisputed that Defendants sent a wide array of materials in varying states to CRS. Although Defendants argued, generally, that the recycling exception applies to their materials, they failed to present sufficient evidence that they fit within the exception. For example, no testimony was presented stating what a commercial specification grade is in this case, that the materials met a commercial specification grade, that there was a market for the recycled materials from 2013–2014 when Defendants' e-waste was in the facility, or that a substantial portion of recyclable material was made available for use as a feedstock for new products. *See* 42 U.S.C. § 9627(c). At trial, Defendants argued that there was no reliable evidence presented at trial that the broken, cracked, or harvested CRTs could not be recycled. Trial Tr. 392:8–392:20. Defendants' expert, Mr. Braswell, testified that the majority of the electronic equipment was comprised of recyclable metal, plastic, and glass. Trial Tr. 291:23–292:4. Mr. Eger also testified that Defendants recycled as often as they could. However, this is insufficient evidence to support a conclusion that Defendants fit under the recycling exception.

Plaintiff also noted in closing that Defendants sent crushed and harvested materials to CRS that could not be recycled. Trial Tr. 364:22–365:10; *see* Defs.' Exs. 19, 20; Trial Tr. 89:1–89:25 (stating that the e-waste in the warehouse was not sorted for recycling because it would have produced an inferior product or product that was not valuable). Further, Plaintiff's expert, Mr.

Oliver, testified that, even if the e-waste in the facility contained recyclable components, the e-waste was not recyclable due to the condition of the e-waste and the way it was stored. Trial Tr. 88:20–89:25. Lastly, the Defendants' agreement with CRS, which contemplates recycling, also explicitly contracts for CRS to dispose of Defendants' e-waste containing hazardous materials. Pl.'s Ex. 51. Defendants did not present sufficient evidence at trial to rebut Plaintiff's testimony regarding recycling. For these reasons, Defendants have not met their burden of establishing that the transaction between Defendants and CRS involved "recyclable material" pursuant to § 127 or that Defendants arranged for recycling of such recyclable material. For these reasons, the Court finds that the recycling exception to arranger liability does not apply in this case.

Defendants are strictly liable for response costs pursuant to § 107(a) of CERCLA because the Court concludes that Defendants are responsible persons pursuant to § 107(a) and there was a release or threat of release of a hazardous substance on the premises, and because the parties do not dispute that the property is a "facility" pursuant to § 101(9), and that the alleged release or threat of release has caused Plaintiff to incur response costs. Therefore, Defendants are liable jointly and severally pursuant to § 107(a)(3) of CERCLA. *See Ashley II of Charleston*, 791 F. Supp. 2d at 481; *United States v. S.C. Recycling & Disposal, Inc.*, 653 F. Supp. 984, 994 (D.S.C. 1984).

### C. Contribution

In their amended answer to the amended complaint, Defendants brought a counterclaim against Plaintiff for contribution pursuant to § 113(f) of CERCLA.[3] Section 113(f)(1) enables

---

[3] The Court has determined that Defendants are liable for response costs pursuant to § 107(a). "Liability under CERCLA § 107(a) is joint and several if the harm is indivisible." *Ashley II of Charleston*, 791 F. Supp. 2d at 481 (citation omitted); *see S.C. Recycling & Disposal, Inc.*, 653 F. Supp. at 994. At trial, Defendants did not dispute that the harm at the facility is indivisible. Rather, they argued that, pursuant to their § 113(f) claim and equitable factors, they should be responsible

"[a]ny person [to] seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title." 42 U.S.C. § 9613(f). "A party making a claim under CERCLA § 113(f) bears the burden of proving: 1) that the defendant is a responsible party under § 107(a) of CERCLA; and 2) the defendant's equitable share of costs." *Ashley II of Charleston*, 791 F. Supp. 2d at 490. The Court has already determined that Defendants are liable pursuant to § 107(a), that the property is a "facility," and that Plaintiff is a PRP pursuant to § 107(a)(1), which includes "owner[s] and operator[s] of a vessel or a facility."

"In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate," 42 U.S.C. § 9613(f), and it "is not limited to any specific equitable factors in deciding how to apportion liability," *Dent v. Beazer Materials & Servs., Inc.*, 993 F. Supp. 923, 950 (D.S.C. 1995). "CERCLA not only entrusts the district court to make the ultimate equitable allocation of costs, but it also grants the court the authority to decide which equitable factors will inform its decision in a given case." *Kerr–McGee Chem. Corp. v. Lefton Iron & Metal Co.,* 14 F.3d 321, 326 (7th Cir. 1994). "The fact-intensive inquiry is 'particularly suited' to case-by-case analysis." *NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 695 (7th Cir. 2014).

"The Gore Factors are six equitable factors derived from the legislative history of CERCLA that are relevant in most CERCLA cases" for allocating contribution costs. *Ashley II of*

---

for none or only up to 3% of the response costs. Liability under § 113(f) is several, not joint and several. *Minyard Enter., Inc. v. Se. Chem. & Solvent Co.*, 184 F.3d 373, 385 (4th Cir. 1999). As a procedural matter, the Court concludes that, based on the undisputed evidence and the parties' arguments, the harm at the facility was indivisible due to the condition of the facility at the time of cleanup, and moves on to consider the equitable allocation between the parties pursuant to § 113(f).

*Charleston*, 791 F. Supp. 2d at 490. The Gore Factors are (1) the ability of the parties to demonstrate that their contribution to a discharge, release, or disposal of a hazardous waste can be distinguished; (2) the amount of hazardous waste involved; (3) the toxicity of the hazardous waste involved; (4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (6) the degree of cooperation by the parties with Federal, State, or local officials to prevent harm to the public health or the environment. *See Dent*, 993 F. Supp. at 950 (citing *United States v. R.W. Meyer, Inc.*, 932 F.2d 568 (6th Cir. 1991). Other courts have considered "[t]he party's level of culpability," and "[t]he degree to which the party benefitted from disposal of the waste," known as the "Torres Factors." *See Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92, 123 (D.D.C. 2014), *aff'd* 833 F.3d 225 (D.C. Cir. 2016); *see also United States v. Davis*, 31 F. Supp. 2d 45, 63 (D. R.I. 1998); *Roberts v. Heating Specialist, Inc.*, No. 3:12-cv-01820-SI, 2014 WL 3845877, at *17 (D. Or. Aug. 5, 2014). Courts have also considered the financial benefit parties gained from remediation of the site; the parties' knowledge of the operation, and their acquiescence to those dangers; degree of fault; the benefit of the operation to the parties; and relative equality. *See Litgo N.J., Inc. v. Martin*, 2011 WL 65933, at *9 (D. N.J. Jan. 7, 2011); *Weyerhauser Co. v. Koppers Co.*, 771 F. Supp. 1420, 1426 (D. Md. 1991); *City of Wichita v. Trustees of APCO Oil Corp. Liquidating Trust*, 306 F. Supp. 2d 1040, 1101 (D. Kan. 2003).

Consistent with relevant case law, the Court will consider the equitable factors it deems relevant to determine the equitable contribution of each of the parties. *See Ashley II of Charleston*, 791 F. Supp. 2d at 490. In many cases where courts have considered equitable allocation of cleanup costs, the PRPs who were directly responsible for the release or discharge of waste were joined as

parties in the lawsuit. The allocation becomes more difficult where, as here, the most responsible party—CRS—was not joined.[4]

In determining the parties' equitable allocations, the Court considers that Plaintiff incurred $1,488,351.98 in response costs to remove the e-waste and clean the contaminated facility consistent with the National Contingency Plan. Thereafter, Plaintiff received $355,791.00 in settlements from other potentially responsible parties. At trial, Plaintiff sought $1,132,560.98 in cleanup costs plus interest. The hazardous materials that were released at the facility include lead, zinc, tungsten, titanium, zirconium, and other types of metals. *See supra* ¶ 25. There was a threat of release of hazardous materials contained in the e-waste, including lead, cadmium, arsenic, strontium, and zinc. *See supra* ¶ 25. Mr. Cheek opined that the dust may have been blown out of the warehouse or "been tracked in and out either by equipment or personnel working in the warehouse." *See supra* ¶ 27. As a result of the contamination, Plaintiff removed over 6 million pounds of e-waste from the facility. *See supra* ¶ 12.

1.      In determining Horry County's equitable share of the response costs, the Court deems the following facts particularly important:

a.      Horry County generated significant e-waste found in the Plaintiff's facility. Notably, it arranged for CRS to haul its e-waste to the facility, where it was processed and recycled or disposed of by CRS. Horry County was aware that its e-waste contained hazardous substances and intended for its e-waste to be processed by CRS. Testimony at

---

[4] CRS, the party responsible for the mismanagement and crushing of the e-waste, has filed for bankruptcy. There is evidence that parties who were not named in the instant action contributed to the e-waste found at the facility. Plaintiff did not explain why the other parties who had waste in the warehouse were not joined. However, the Court will decide this matter based on the arguments and evidence presented by the parties at trial.

trial suggests that Horry County made some effort to recycle or safely dispose of its e-waste. *See supra* ¶¶ 7–9.

      b.      Horry County's contract with CRS contemplates recycling of junk/surplus equipment, as well as disposal of e-waste. *See supra* ¶ 9.

      c.      CRS collected e-waste from Horry County initially at no cost. At some point, CRS began charging a fee. Horry County did not incur significant costs to get the e-waste removed and transported to the facility. *See supra* ¶ 10.

      d.      When Plaintiff contacted Defendants regarding the abandoned e-waste, Horry County did not remove the equipment or e-waste and did not cooperate with the clean up of the facility. *See supra* ¶ 13.

      e.      Horry County did not label any of its e-waste before it was hauled by CRS. *See supra* ¶ 19.

      f.      From July 1, 2013 through June 30, 2014, CRS picked up 1,826,494 pounds of e-waste from Horry County. *See supra* ¶ 29.

      g.      Based on the testimony of Mr. Oliver, Horry County contributed approximately 28.23% of the Total Weight of Waste Volume that was contained in the facility. *See supra* ¶ 31.

2.      In determining Lexington County's equitable share of the response costs, the Court deems the following facts particularly important:

      a.      Lexington County generated significant e-waste found in the facility. Notably, it arranged for CRS to haul its e-waste to the facility, where it was processed and recycled or disposed of by CRS. Lexington County was aware that its e-waste contained hazardous substances and intended for its e-waste to be processed by CRS. Testimony at

trial suggests that Lexington County made some effort to recycle or safely dispose of its e-waste. *See supra* ¶¶ 7–9.

      b.     Lexington County's contract with CRS contemplates recycling of junk/surplus equipment, as well as disposal of e-waste. *See supra* ¶ 8.

      c.     CRS collected e-waste from Lexington County initially at no cost. At some point, CRS began charging a fee. Lexington County did not incur significant costs to get the e-waste removed and transported to the facility. *See supra* ¶ 10.

      d.     When Plaintiff contacted Defendants regarding the abandoned e-waste, Lexington County did not remove the equipment or e-waste and did not cooperate with the clean up of the facility. *See supra* ¶ 13.

      e.     Lexington County was aware that its e-waste was traveling to the facility, and it sent employees to the facility to observe the warehouse and CRS's process. *See supra* ¶ 22.

      f.     From July 1, 2013 through June 30, 2014, CRS picked up 784,924 pounds of e-waste from Lexington County. *See supra* ¶ 32.

      g.     Lexington County generated approximately 12.13% of the Total Weight of Waste Volume sent to CRS from July 1, 2013 until June 30, 2014. *See supra* ¶ 32.

    3.     In determining Plaintiff's equitable share of the response costs, the Court deems the following facts particularly important:

      a.     Plaintiff and CRS entered into a lease agreement from July 1, 2013 until June 30, 2014, wherein Plaintiff leased the facility to CRS for CRS to store and distribute materials. Notably, the lease contained a "hold harmless" provision for CERCLA violations by CRS while it was leasing Plaintiff's warehouse. Additionally, the lease

agreement contained provisions that allowed Plaintiff to inspect the warehouse and also to inspect CRS's financial statements. *See supra* ¶ 4.

b.      Based on the evidence, Plaintiff was clearly aware that the materials CRS was storing in the facility contained hazardous substances. Plaintiff also knew that CRS was in the business of recycling those materials. However, Plaintiff did not inspect the warehouse or request CRS's financial records before CRS declared bankruptcy. *See supra* ¶ 6.

c.      Plaintiff removed approximately six million pounds of e-waste from the facility. *See supra* ¶ 12.

d.      By letter dated November 4, 2015, Plaintiff contacted Defendants and directed Defendants to remove the equipment and e-waste. Plaintiff also agreed to a consent order in order to allow Defendants a scheduled inspection of the facility. *See supra* ¶ 13.

e.      Plaintiff cooperated with cleanup by hiring environmental consultants to safely evaluate, handle, and remove the e-waste at the facility. Plaintiff's environmental consultants retained a Certified Industrial Hygienist to evaluate contamination levels at the facility, provide a Worker Health and Safety Plan, and evaluate post-removal conditions. *See supra* ¶ 14.

f.      Plaintiff benefitted from the timely clean up of the e-waste because, in order for Plaintiff to sell the warehouse, the e-waste had to be safely disposed of. *See supra* 16. Plaintiff also benefitted from CRS's tenancy because CRS paid Plaintiff rent. *See supra* ¶ 5.

g.      The Court concludes that Plaintiff took no active part in introducing e-waste

or hazardous materials to the facility or in spreading the contamination. Further, Plaintiff did not benefit from CRS's recycling, disposal, or storage process that caused the release or threat of release of hazardous substances.

       h.    There is direct evidence in the record to support that Plaintiff knew its warehouse was being used to store e-waste that contained hazardous substances. *See supra* ¶ 6.

In accordance with the equitable factors mentioned above and those considered by the Court, the Court finds that Horry County is responsible for approximately 11.292% percent and Lexington County is responsible for approximately 4.852% percent of the total response costs. The percentages are based on calculations set forth in greater detail below. The law in this area clearly focusses on the liability of the arranger, and the Court considers that Defendants arranged for CRS to treat or dispose of their e-waste. The Court also considers that Defendants contracted to treat and recycle some of their e-waste. While waste volume is only one factor related to equitable allocation, it is an important factor here. The Court affords great weight to Mr. Oliver's determination based on the depth of his analysis that Defendants are responsible for generating a total of approximately 40.36% of the total waste volume.

Many equitable factors have been discussed previously. The Court will highlight one particular factor. Plaintiff was the only party involved in this lawsuit with access to the facility and the right to inspect the property. With the knowledge Plaintiff had regarding the materials being stored in its warehouse, it could have taken steps to ensure there would be proper storage to prevent or limit a release of hazardous materials. Some crushing of hazardous materials took place in the facility. Certain components of the e-waste contributed to the release. If Plaintiff had inspected its property, less release and fewer cleanup costs may have resulted. Plaintiff took no significant steps

to inspect or mitigate any release that occurred. In contrast, Defendants ensured that CRS was certified before they contracted with CRS, and Lexington County sent agents to the Blythewood facility when it was notified that there was a new facility in South Carolina. Further, Defendants did not have keys to access the facility. Accordingly, based on the evidence presented at trial, Defendants' allocation of response costs should not exceed 40.36% (28.23% and 12.13%, respectively) of the total cleanup costs in this case, and the Court finds that Defendants' allocation should be further reduced based on the degree of care exercised by each of the parties as noted in the equitable factors set forth. The Court determines that Defendants' equitable allocation should be reduced by an additional sixty percent (60%) based on Plaintiff's liability, making the Defendants' allocation forty percent (40%) of their contribution to the waste volume (40.36%). The Defendants' total contribution is 16.144%.

After careful consideration of the facts and equities, judgment shall be entered for Plaintiff in the amount of $168,064.70 against Horry County (the amount of its liability minus Lexington County's and Plaintiff's equitable allocation of the response costs). Judgment shall be entered for Plaintiff in the amount of $72,214.84 against Lexington County (the amount of its liability minus Horry County's and Plaintiff's allocation of the response costs). Further, the specific amounts were determined based on the following calculations:

1.    The total cleanup costs were $1,488,351.98.

2.    Using Oliver's testimony, the volume of e-waste attributed to Horry County was 28.23%.

3.    28.23% x $1,488,351.98 is $420,161.76.

4.     Applying the other equitable factors with Horry County responsible for 40%, the recovery against Horry County is $168,064.70—which is 11.292% of the total response costs requested by Plaintiff.

5.     Using Oliver's testimony, the volume of e-waste attributed to Lexington County was 12.13%.

6.     12.13% x $1,488,351.98 is $180,537.10.

7.     Applying the other equitable factors with Lexington County responsible for 40%, the recovery against Lexington County is $72,214.84—which is 4.852% of the total response costs.

8.     The recovery against Horry County is $168,064.70, and for Lexington County is $72,214.84, for a total recovery against Defendants in the amount of $240,279.54.

## CONCLUSION

Defendants are liable to Plaintiff for response costs pursuant to § 107(a)(3) of CERCLA. Defendants' liability is joint and several. However, Plaintiff is responsible for an equitable amount of the response costs pursuant to §§ 107(a)(1) and 113(f) of CERCLA. The Court hereby allocates the response costs pursuant to CERCLA § 113(g)(2)(B) in the amount of $168,064.70 for Horry County and $72,214.84 for Lexington County—the total recovery from these Defendants being $240,279.54.

**IT IS SO ORDERED**.

___*s/Terry L. Wooten*_____
Chief United States District Judge

November 14, 2018
Columbia, South Carolina

27